# UNITED STATES DISTRICT OCURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| John Richard Sigerseth, | Case No. 16-cv-3296 (JRT/TNL) |
| Plaintiff, | |
| v. | **REPORT &** |
| | **RECOMMENDATION** |
| Nancy A. Berryhill,[1] | |
| Acting Commissioner of Social Security, | |
| Defendant. | |

Paul A. Livgard and Sonja R. Oritz, Livgard & Lloyd, PLLP, 2520 University Avenue Southeast, Suite 202, Minneapolis, MN 55414 (for Plaintiff); and

Gregory G. Brooker, Acting United States Attorney, and Bahram Samie, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

## I. INTRODUCTION

Plaintiff John Richard Sigerseth brings the present case, contesting Defendant Commissioner of Social Security's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment (ECF No. 12) and the Commissioner's Motion for Summary Judgment (ECF No. 16). These motions have

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. *The Acting Commissioner of Social Security*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner.html (last visited Feb. 1, 2017). Commissioner Berryhill is automatically substituted for the previous Acting Commissioner of Social Security Carolyn W. Colvin. Fed. R. Civ. P. 25(d) (public officer's successor is automatically substituted as party when officer ceases to hold office while action is pending).

been referred to the undersigned for a report and recommendation to the district court, the Honorable John R. Tunheim, Chief District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 12) be **DENIED** and the Commissioner's Motion for Summary Judgment (ECF No. 16) be **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in July 2013, asserting that he has been disabled since February 2, 2011, due to posttraumatic stress disorder, major depressive disorder, and anxiety.[2]  (Tr. 10, 47, 58, 60, 72, 124-25, 169.)  Plaintiff's application for DIB was denied initially and again upon reconsideration.  (Tr. 10, 56, 57, 58, 69, 71, 72; *see* Tr. 78-80, 83-85.)  Plaintiff appealed the reconsideration of his DIB determination by requesting a hearing before an administrative law judge ("ALJ").  (Tr. 10, 86-87; *see* Tr. 88-91.)

The ALJ held a hearing in June 2015.  (Tr. 10, 34, 36; *see* Tr. 95-114, 118-21. After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied his request for review.  (Tr. 1-5, 7-25, 32.)  Plaintiff then filed the instant action, challenging the ALJ's decision.  (Compl., ECF No. 1.)  The

---

[2] Plaintiff also included knee pain as a disabling impairment.  (Tr. 47, 60, 169.)  Plaintiff's physical impairment(s), however, are not presently at issue.

parties have filed cross motions for summary judgment. (ECF Nos. 12, 16.) This matter is fully briefed and ready for a determination on the papers.

## III. RELEVANT MEDICAL HISTORY

In order to be entitled to DIB, Plaintiff must establish that he was disabled before his insurance expired. *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (citing *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)). It is undisputed that Plaintiff's date last insured was September 30, 2011. (Tr. 10, 47, 58, 60, 63, 72; Pl.'s Mem. in Supp. at 4, ECF No. 14; Comm'r's Mem. in Supp. at 2, ECF No. 17.) Thus, Plaintiff must prove that he was disabled before September 30, 2011. Accordingly, the period presently at issue is February 2, 2011, the alleged onset date, through September 30, 2011, the date last insured. Nevertheless, "[e]vidence from outside the insured period can be used in helping to elucidate a medical condition during the time for which benefits might be rewarded." *Cox*, 471 F.3d at 907 (quotation omitted).

### A. Medical Records up to Date Last Insured

Plaintiff is a veteran of the United States Army and Navy. (Tr. 336; *see* Tr. 245.) Plaintiff served in the United States Army for 3 years and in the United States Navy for 17 years.[3] (Tr. 245.) Since 2000, Plaintiff has been seen at the Veterans Affairs Medical Center for posttraumatic stress disorder and depression. (Tr. 336; *see* Tr. 385.) Plaintiff has received individual psychotherapy from Bridget M. Hegeman, Ph.D., L.P., since 2004. (Tr. 336.) Plaintiff's medications have been managed by Gihyun Yoon, M.D. (Tr. 336.)

---

[3] The Court pauses for a moment to thank Plaintiff respectfully for his years of service.

In December 2010, Plaintiff underwent a compensation and pension examination related to posttraumatic stress disorder, anxiety, and depression for service-connected disability through the Department of Veterans Affairs ("VA"). (Tr. 244.) The psychological examination was performed by Wayne Siegel, Ph.D., ABPP. (Tr. 244.) During the examination, Plaintiff reported "long-standing difficulties with depression that is fairly constant," rating his current depression at 5 on 1-to-10 scale with 1 being the worst. (Tr. 245.) Plaintiff reported that this was "typical of most days." (Tr. 245.) Plaintiff "described his depression as 'being very serious and not deriving much pleasure from things.'" (Tr. 245.) Plaintiff also reported "significant problems with early and middle insomnia," having difficulties falling asleep and then waking up due to nightmares or noise. (Tr. 245-46.)

Plaintiff "described his energy level as low," but was "able to force himself to do things that he needs to," particularly with respect to caring for his significant other. (Tr. 246.) Plaintiff also "indicated some difficulties with feelings of helplessness and hopelessness" and "described some anhedonia." (Tr. 246.) Plaintiff "denied problems with suicidal thoughts or attention/concentration." (Tr. 246.)

Plaintiff "enjoy[ed] doing crossword puzzles and reading novels for a least an hour per day," but "sometimes . . . g[o]t distracted after a while and will then move on to something else." (Tr. 246.) Plaintiff "reported that the only thing that he derives significant pleasure from is gardening which he only does in the warmer months." Plaintiff reported "get[ting] some pleasure out of reading history and spending time with his . . . [significant other]" of 14 years. (Tr. 245, 250.)

Siegel noted that Plaintiff's significant other has multiple sclerosis and uses an electric wheelchair. (Tr. 249.) Plaintiff "has to do a lot of basic functions in terms of cleaning and cooking that she is unable to do." (Tr. 249.) Plaintiff stated that "being with her makes his life better in that he would be less likely to take care of himself if he were not." (Tr. 249.) Siegel noted, however, that "records indicate that the relationship is more problematic tha[n] . . . [Plaintiff] described and it may be a significant contributing factor [in] his life difficulties." (Tr. 250.)

Plaintiff reported "feel[ing] anxious a lot," particularly in crowds. (Tr. 246.) Plaintiff could to go to stores "but avoids large malls and very large crowds." (Tr. 246.) Plaintiff also "d[id] not like a lot of noise," which also caused him to avoid large crowds. (Tr. 246.) Plaintiff reported that he avoids newscasts about war and war movies. (Tr. 246.) Additionally, Plaintiff reported "a long history of panic with classic physiologic symptoms occurring weekly in the past but once per month or so in the past several months." (Tr. 246.) Plaintiff reported that "there are not clear precipitants other than when he gets very frustrated or angry." (Tr. 246.)

Plaintiff was polite and cooperative during the examination. (Tr. 244.) He was alert and oriented and his gross memory and cognitive functions were intact. (Tr. 246.) Plaintiff's speech was logical and goal-directed, and he spoke at a normal rate. (Tr. 246.) Plaintiff "displayed no evidence of a thought disorder or other overt psychotic processes." (Tr. 246.) Plaintiff's "[m]ood was dysthymic to depressed" and he became tearful when discussing military efforts in Iraq and Afghanistan, the death of a friend, and his awareness that his significant other will pass away "at some point in the not too

distant future" due to multiple sclerosis. (Tr. 246-47.) Plaintiff "did not evidence significant problems with concentration." (Tr. 248.)

Siegel determined that Plaintiff met the criteria for posttraumatic stress disorder. (Tr. 247-48, 251.) Plaintiff experienced a number of traumatic events, including the unexpected death of a friend "for no apparent reason"; being assaulted while serving in the Army; surveying bomb damage during the Gulf War; assisting with search-and-rescue efforts following the 1989 earthquake in San Francisco, California; and witnessing a Navy training accident "where a sailor's skull was crushed by the boat's prop." (Tr. 247.)

While Plaintiff did not re-experience these events while awake, he reported dreaming about them approximately three times per week. (Tr. 247.) Plaintiff reported that, in previous years, he dreamed about them nightly. (Tr. 247.) Plaintiff reported that "when he encounters things such as war movies or newscasts about the war he will think about these events," and they will "consume his thoughts making it hard to focus on what he was doing." (Tr. 247.) Plaintiff "did not describe them as significantly distressing but rather distracting." (Tr. 247.) Plaintiff did not like to talk about these events and was "pretty successful in keeping them out of his day-to-day consciousness while awake." (Tr. 247-48.)

Plaintiff described "symptoms of avoidance and numbing." (Tr. 247.) Plaintiff "generally fe[lt] disconnected from others" and "indicated that he has no real friends and does not have a close relationship with anyone." (Tr. 248.) Plaintiff also "described feeling on guard and alert and having to walk the perimeter around his house, particularly

when he wakes up from a nightmare." (Tr. 248.) To some extent, Plaintiff felt like he was always on duty. (Tr. 248.) Plaintiff further reported "overreacting to loud noises." (Tr. 248.)

In addition, Plaintiff "described several examples of irritability and increased anger." (Tr. 248.)

> He has had difficulty interpersonally with others and on the job. He has been fired from several positions since his discharge from the service. He talked about how his . . . [significant other's] friends do not like being around him because he is irritable, and angry, and they feel he is scary at times.

(Tr. 248.) Plaintiff reported being terminated from previous employment due to conflicts with other employees and supervisors. (Tr. 250.) Plaintiff was currently supporting himself with his pension and "occasional temporary work." (Tr. 250.)

Siegel noted that Plaintiff first had contact with mental-health professionals in 2000 and had been followed by Hegeman "on a fairly regular basis" since 2004 for posttraumatic stress disorder and depression. (Tr. 248.) Siegel also noted that Plaintiff was currently prescribed bupropion,[4] citalopram,[5] and hydroxyzine[6] by Dr. Yoon. (Tr. 248.) Plaintiff reported that his sessions with Hegeman were helpful and his medications were "somewhat helpful in that they keep him calmer." (Tr. 248.) Siegel noted that

---

[4] Bupropion is used to treat depression. *Bupropion (By mouth)*, PubMed Health, U.S. Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009361/ (last visited July 26, 2017).
[5] Citalopram is also used to treat depression. *Citalopram (By mouth)*, PubMed Health, U.S. Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009639/ (last visited July 26, 2017).
[6] "Hydroxyzine is used to help control anxiety and tension caused by nervous and emotional conditions." *Hydroxyzine*, PubMed Health, U.S. Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009639/ (last visited July 26, 2017).

Plaintiff "made it clear that he still struggles with the depression and anxiety." (Tr. 248-49.)

Plaintiff's Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") results produced a valid profile, reflecting "very significant levels of psychological/emotional distress." (Tr. 244, 250.) Siegel noted that Plaintiff was "quite unhappy with his current life situation and feels there is little he can do to infect change." (Tr. 250.) Plaintiff's profile was "notable for significant depressive symptoms and a general lack of interest or pleasure in day-to-day activities." (Tr. 250.) Plaintiff's profile also contained "indications of significant anxiety, tension/nervousness." (Tr. 251.) Siegel noted that Plaintiff "likely tends to over focus on physical/somatic symptoms and there is a tendency to cope with psychological/emotional difficulties with physical symptomology." (Tr. 251.) Siegel noted that "[s]imilar individuals tend to feel uncomfortable and awkward in social/interpersonal situations and invest considerable effort into avoiding such." (Tr. 251.)

Siegel diagnosed Plaintiff with posttraumatic stress disorder and major depressive disorder and gave him a GAF score[7] of 60. (Tr. 251.) Siegel found that Plaintiff

---

[7] The Global Assessment of Functioning ("GAF") scale is a rating of overall functioning on a scale of 0 to 100, taking into account psychological, social and occupational functioning. Diagnostic and Statistical Manual of Mental Disorder 34 (American Psychological Association 4th ed. text revision 2000) ("DSM-IV-TR"). . . . Scores of 41-50 indicate serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* Scores of 51-60 indicate moderate symptoms or any moderate difficulty in social, occupational or school functioning. *Id.* Scores of 61-70 indicate some mild symptoms or some difficulty in social, occupation or school functioning but generally functioning pretty well. *Id.*

"evidences significant depressive symptoms that appear to be at least partially related to his [posttraumatic stress disorder]," but were "also likely at least partially attributable to the stress of his current life situation," citing Plaintiff's role as a caretaker for his significant other and unemployment. (Tr. 251.) Siegel determined that Plaintiff "appears to have experienced moderate social and occupational impairment" as a result of his posttraumatic stress disorder and depression. (Tr. 252.) Siegel concluded that "it is, as likely as not, that [Plaintiff] meets diagnostic criteria for [posttraumatic stress disorder] related to traumatic events he encountered while [on] active duty" and it was as likely as not that Plaintiff's depression met the diagnostic criteria and was "at least in part related to his military service." (Tr. 252.)

At the end of January 2011, the VA granted Plaintiff 50% service-connected disability for his posttraumatic stress disorder, depression, and anxiety, for a combined rating of 60%. (Tr. 37, 155, 159.) There are no mental-health treatment records from February through September 2011. (*See* Comm'r's Mem. in Supp. at 7.)

### B. Medical Records from October through December 2011

In October 2011, Hegeman noted that Plaintiff "continues to exhibit some irritability, low frustration tolerance, mild depressive symptoms and sleep disturbance." (Tr. 336.) Hegeman identified Plaintiff's role as a caretaker for his significant other with "moderate to severe" multiple sclerosis, "their ongoing relationship problems," "deaths of several family members in the last few years," and financial stressors as areas of concern

---

*McDermott v. Astrue*, No. 11–cv–2409 (PJS/AJB), 2012 WL 3202946, at *2 n. 2 (D. Minn. June 13, 2012), *adopting report and recommendation*, 2012 WL 3156003 (D. Minn. Aug. 3, 2012).

for Plaintiff. (Tr. 336; *see* Tr. 335.) Hegeman noted that Plaintiff "has been unable to maintain steady employment since his discharge," but was "recently awarded an increase in his service connection [benefits], which has reduced . . . [his financial] stressors significantly." (Tr. 336-37.) Hegeman also noted that Plaintiff and his significant other participated in six months of couples' counseling. (Tr. 335.)

Plaintiff's current medications included bupropion, venlafaxine,[8] and hydroxyzine. (Tr. 336; *see* Tr. 332.) Hegeman noted that Plaintiff "has made progress in managing some of his anxiety and frustration, but still exhibits limitations especially when stressed with other issues," and "does have difficulty recognizing a need for help." (Tr. 337.) Plaintiff's psychotherapy sessions focused on these issues as well as stress management and self-care. (Tr. 337.) Plaintiff's strengths were his sense of humor, family support, pursuit of employment, and willingness to participate in therapy. (Tr. 335.) Hegeman felt that Plaintiff would benefit from attending therapy more often, but this was not possible "due to his availability limitations." (Tr. 337.) Hegeman gave Plaintiff a GAF score of 55 and described Plaintiff's level of care as one hour or less per month. (Tr. 333, 334.)

In mid-November 2011, Plaintiff and his significant other were discharged from couples' therapy. (Tr. 328.) The couple reported that "things have remained the same." (Tr. 329.) The therapist noted that "[t]hey did not try to incorporate any of the behavior changes we discussed (having meetings to discuss household chores, using

---

[8] Venlafaxine is used to "[t]reat[] depression, generalized anxiety disorder, panic disorder, and social anxiety disorder." *Venlafaxine (By mouth)*, PubMed Health, U.S. Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012623/ (last visited July 26, 2017).

communication skills, etc[.]),'' and "[b]oth acknowledged that they had intentions to do so, but did not." (Tr. 329.) Plaintiff and his significant other requested a referral to a new therapist and the therapist noted that they "would benefit from further couples therapy if they are able to demonstrate efforts to practice skills/do 'work' at home." (Tr. 329.) In the interim, the therapist encouraged the couple "to begin incorporating new behaviors immediately rather than waiting for a new therapist." (Tr. 329.)

Around the same time, Plaintiff saw Dr. Yoon for a medication management appointment. (Tr. 330.) Plaintiff reported "having less anxiety and more depression (lack of motivation) for the past month." (Tr. 330.) Plaintiff's stressors included the worsening of his significant other's medical condition and unemployment. (Tr. 330.) Plaintiff also reported that he "stopped looking for a job as 'they reject me all the time.'" (Tr. 330.) Plaintiff's mood was depressed, but he was cooperative without psychomotor agitation or retardation; his speech was coherent, relevant, and fluent with normal rate and volume; his affect was appropriate; his thought process was goal-oriented without abnormal content; his memory and cognition were grossly intact; and his insight and judgment were fair. (Tr. 331.) Dr. Yoon switched Plaintiff from Celexa[9] to venlafaxine, and directed him to return in four months. (Tr. 332. *But see* Tr. 336.) Approximately one month later, Plaintiff called Dr. Yoon and stated that the venlafaxine "has helped a little" but he "would like to increase the dose." (Tr. 332; *see* Tr. 333.) Dr. Yoon

---

[9] Celexa is a brand name for citalopram. *Celexa*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a699001.html (last visited July 26, 2017). *See supra* n.5.

increased Plaintiff's venlafaxine dose and instructed Plaintiff to continue taking Wellbutrin.[10]  (Tr. 333.)

### C. Medical Records From 2012 and 2013

Towards the end of March 2012, Plaintiff had a medication management appointment with Dr. Yoon in connection with his posttraumatic stress disorder, depression, insomnia, and nightmares.  (Tr. 306.)  Dr. Yoon noted that Plaintiff's relationship was causing him stress.  (Tr. 306.)  Upon examination, Dr. Yoon observed Plaintiff to be cooperative and tearful with no psychomotor movement.  (Tr. 307.)  Plaintiff's speech was coherent, relevant, and fluent and had normal rate and volume.  (Tr. 308.)  Plaintiff's mood was anxious and depressed and his affect was appropriate.  (Tr. 308.)  Plaintiff's thought process was goal-oriented, his memory and cognition were grossly intact, and his insight and judgment were fair.  (Tr. 308.)  Dr. Yoon added two medications: trazodone[11] to improve Plaintiff's sleep and Klonopin[12] to help with Plaintiff's anxiety.  (Tr. 306, 308.)

Plaintiff continued to meet periodically with Hegeman between 2012 and 2013. Between mid-October 2012 and mid-February 2013 and mid-October 2013 and mid-December 2013, Plaintiff saw Hegeman approximately every two weeks.  (Tr. 261, 262, 265, 267, 271, 273, 279, 283, 366, 370, 371, 372.)  Otherwise, their sessions were months apart.  (Tr. 252, 257, 261, 283, 296.)  In April 2012, Hegeman gave Plaintiff a GAF score

---

[10] Wellbutrin is a brand name for bupropion.  *Bupropion (By mouth) (Wellbutrin)*, PubMed Health, U.S. Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009361/ (last visited July 26, 2017).  *See supra* n.4.

[11] Trazodone is used to treat depression.  *Trazodone (By mouth)*, PubMed Health, U.S. Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012504/ (last visited July 26, 2017).

[12] Klonopin is a brand name for clonazepam and is used to treat panic attacks.  *Clonazepam*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682279 html (last visited July 26, 2017).

of 55 and noted that he needed between two and eight hours of therapy per month. (Tr. 296, 297.) Plaintiff reported that he "c[a]me to the conclusion that he will not pursue competitive employment as he recognizes that he is not capable of maintaining this successfully." (Tr. 300.) Hegeman noted that, with continued participation in "insight-oriented therapy," Plaintiff "has exhibited greater awareness of his internal experience" and was "making slow but generally steady progress." (Tr. 300.)

Plaintiff's treatment goals centered on improving his relationship with his significant other, managing his anger, and utilizing coping skills. (Tr. 271, 298.) Their sessions frequently focused on stress resulting from and conflict within Plaintiff's relationship. (Tr. 262-63, 265, 271, 279, 283.) They also talked about Plaintiff's avoidance of emotional interactions and emotions in general as well as ways to improve communication. (Tr. 262-63, 265, 267-68, 271, 273.)

Hegeman described Plaintiff as casually dressed and fully engaged with a logical and coherent thought process and good eye contact. (Tr. 266, 268, 271-72, 274, 280, 283, 367, 371, 372, 373.) Often, Plaintiff's mood was initially angry and irritated becoming more subdued during the session. (Tr. 274, 280, 283.) Otherwise, his mood was generally euthymic or neutral. (Tr. 253, 258, 261, 266, 268, 271-72, 354, 367, 371, 372, 373.) Plaintiff's affect was congruent with the topics discussed. (Tr. 253, 258, 367, 371, 372, 373.) Hegeman also noted that Plaintiff tended to shift away from difficult topics and unpleasant emotions, although this improved somewhat over the course of their sessions. (Tr. 253, 258, 261, 367, 371, 372, 373.)

At one point, Plaintiff "ultimately commented that he needs to learn different ways of thinking about . . . [certain] issues because his anger becomes so intense and it is not helpful for him." (Tr. 274.) Hegeman described this insight as "significant progress for . . . [Plaintiff] as historically he has always justified his anger as being completely appropriate." (Tr. 274.) In another session, Hegeman noted that Plaintiff was "[s]pontaneously identifying unhelpful thoughts and attitudes, as well as coping strategies he has been using." (Tr. 268.)

Between mid-October 2012 and mid-February 2013, Plaintiff and his significant other attended couples therapy with Martina L. Rodgers, Ph.D., L.P., roughly every two weeks. (Tr. 259, 261, 264, 266, 269, 270, 272, 280, 282, 284; *see* Tr. 353.) Rodgers worked with the couple on communication and active listening skills. (Tr. 264, 266, 269, 273, 281; *see* Tr. 259, 262, 270, 285.) Rodgers encouraged Plaintiff and his significant other to take breaks when discussions turned heated and return to the topic after they had cooled down. (Tr. 285.) Plaintiff and his significant other frequently argued with each other during the sessions, interrupting one another. (Tr. 254, 262, 272, 280-81.) Rodgers gave Plaintiff and his significant other communications exercises to practice at home, but they did not do them. (Tr. 259, 261, 264, 266, 269, 270, 272, 280-81.) In February, Rodgers asked the couple to consider whether they wanted to stay together, and, towards the end of February, Plaintiff and his significant other decided to take a break from therapy. (Tr. 259, 262.)

Similar to Hegeman, Rodgers noted that Plaintiff was casually dressed with appropriate hygiene and had a logical and coherent thought process. (Tr. 259-60, 262,

265, 267, 269, 270, 273, 281, 282, 285.)  While Plaintiff's speech had a normal rate and rhythm, he frequently became irritated with his significant other, speaking intensely at times.  (Tr. 259-60, 262, 265, 267, 269, 270, 273, 281, 282.)

In March 2013, Plaintiff began participating in a research study using mindfulness and meditation to address anxiety.  (*See* Tr. 265, 267.)  Plaintiff's sessions with Hegeman were reduced to accommodate his participation in the study.  (Tr. 265.)  When Hegeman saw Plaintiff in April, Plaintiff reported that he greatly enjoyed participating in the study and noted significant improvement in his ability to function.  (Tr. 258.)  Plaintiff was handling his emotions better and had better communication and less conflict with his significant other.  (Tr. 258.)

Around the end of April, Plaintiff had an acute anxiety attack while participating in his meditation group, becoming "very upset by some of the discussion" and crying uncontrollably.  (Tr. 257.)  Plaintiff was seen in the emergency room and reported that if he had hydroxyzine with him he would have taken it because it usually helps him.  (Tr. 257.)  Plaintiff was given hydroxyzine and his symptoms improved.  (Tr. 256; *see* Tr. 254.)

When Hegeman saw Plaintiff again five months later, Plaintiff reported that he and his significant other had gotten married and were looking to buy a house.  (Tr. 252; *see* Tr. 354.)  Plaintiff reported that they were getting along better and making their relationship a priority.  (Tr. 252; *see* Tr. 373.)  Plaintiff's therapeutic goals focused on caring for himself and his significant other and managing stress.  (Tr. 252.)  Through October and into December, their discussions focused on the new home Plaintiff and his

significant other wanted to purchase and the excitement and stress of the process.  (Tr. 370, 371, 372.)  Plaintiff also talked about the efforts he was making in his marriage and commented on how "a bit of effort can have such a significant positive outcome."  (Tr. 367; *see* Tr. 373.)  Hegeman noted that Plaintiff was making progress in awareness, insight, and his ability to handle emotionally charged topics.  (Tr. 370, 371.)

In early December, Plaintiff had another medication management appointment with Dr. Yoon.  (Tr. 368.)  Plaintiff told Dr. Yoon "he would like to take more medications to better control his anxiety and sleep."  (Tr. 368.)  Plaintiff's mood was anxious and the results of his mental status examination were largely normal.  (Tr. 369.)  Dr. Yoon increased trazadone for Plaintiff's sleep; increased hydroxyzine for Plaintiff's anxiety; and also added Seroquel[13] for Plaintiff's anxiety.  (Tr. 368, 370.)

## IV. MEDICAL OPINION

In April 2015, Hegeman completed a mental medical source statement in connection with Plaintiff's DIB application.  (Tr. 385-87; *see* Tr. 397.)  Plaintiff and Hegeman discussed responses to the form and she "reviewed specific items [with him], eliciting input from . . . [Plaintiff] regarding his functioning level and typical reactions."  (Tr. 397.)  Hegeman noted that Plaintiff's "appraisals of limitations seemed quite accurate and consistent with . . . [her] opinion."  (Tr. 397.).  Hegeman noted that she would finish completing the form and hopefully be able to consult with Plaintiff's psychiatrist "for his additional input."  (Tr. 398.)

---

[13] Seroquel is a brand name for quetiapine and can be used to treat depression.  *Quetiapine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a698019 html (last visited July 26, 2017).

Hegeman included among Plaintiff's diagnoses posttraumatic stress disorder and major depressive disorder "with anxious distress." (Tr. 385.) She noted that Plaintiff had been involved in treatment since 2000; attended psychotherapy one to two times per month or "as needed"; attended medication-management appointments four times per year or "as needed"; and participated in group and couples therapy in the past. (Tr. 385.) Hegeman described Plaintiff's prognosis as "slowly making progress under current lower stress conditions." (Tr. 385.) At the top of the form, Hegeman circled the statement, "Poor: No useful ability to function." (Tr. 385.)

The form then asked Hegeman to rate Plaintiff's ability to understand, remember, and carry out instructions. (Tr. 385.) Hegeman checked "Yes" and wrote "under specific circumstances" when asked if Plaintiff's ability to understand, remember, and carry out instructions was affected by his impairments. (Tr. 385.) Hegeman opined that Plaintiff's ability to understand and remember detailed instructions was poor, and described as good his ability to understand, remember, and carry out short, simple instructions; make simple work-related decisions; and remember locations and work-like procedures. (Tr. 385.)

Hegeman then proceeded to rate Plaintiff's ability to perform a number of work-related mental activities. (Tr. 386.) Hegeman described Plaintiff's ability to perform the following as good: perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; ask simple questions or request assistance; adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently. (Tr. 386.) Hegeman

rated Plaintiff's ability to perform five activities as fair: complete a normal workday or workweek; perform at a consistent pace; interact appropriately with the public; get along with coworkers and peers; and maintain socially appropriate behavior. (Tr. 386.) Lastly, Hegeman rated Plaintiff's ability to perform these four activities as poor: maintain attention and concentration for extended periods; work with or near others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (Tr. 386.) When asked what medical/clinical findings support her assessment, Hegeman wrote: "psychological assessment, behavioral observation in appointments, spouse reports, [and] self reports." (Tr. 386.)

Hegeman opined that Plaintiff's limitations had been present since at least May 2004, the time of her initial assessment of Plaintiff. (Tr. 387.) Hegeman opined that Plaintiff was likely to be off task 25% or more of the time and would be absent more than four days per month. (Tr. 386, 387.)

## V. DISABILITY REPORTS & DETERMINATIONS

### A. Prior to Initial Determination

In September 2013, Plaintiff completed a functional report in connection with his DIB application. (Tr. 175-82.) When asked how his conditions limit his ability to work, Plaintiff stated that he is hypervigilant, always on edge, and angry due to his posttraumatic stress disorder, depression, and anxiety. (Tr. 175; *see* Tr. 181.) Plaintiff stated that loud noises made him jump and he is unable to watch the news as anything about the United States military causes him to become overemotional, get angry, and feel

as though he is still in the military on patrol or watch.  (Tr. 175.)  Plaintiff also reported having vivid nightmares related to his military experiences and is unable to get a full night's sleep without trazodone.  (Tr. 176, 182.)

Plaintiff further stated that he has "no real friends" and has trouble "trusting anyone."  (Tr. 182.)  Plaintiff reported that sometimes his depression is so bad that he will not get out of bed except to use the restroom or eat.  (Tr. 182.)  Plaintiff stated that sometimes he does not shower or tend to his personal hygiene for "days at a time."  (Tr. 182; *see* Tr. 176, 177.)  Plaintiff no longer did activities that he used to enjoy, such as swimming.  (Tr. 182.)  Plaintiff also avoided crowds and confined spaces because they aggravated his posttraumatic stress disorder.  (Tr. 182; *see* Tr. 181.)  Plaintiff also reported having anxiety attacks two to four times per week and tension headaches.  (Tr. 182.)  Plaintiff stated that he is no longer able to "get going, have fun, enjoy hobbies, [or] concentrate."  (Tr. 176.)

When asked to describe a typical day, Plaintiff reported that, if he does not sleep late, he eats, watches television, tries to do some housework, does the dishes, cooks for himself and his significant other, and cares for his significant other.  (Tr. 176.)  Although reporting that he watched television and movies and read on a daily basis, Plaintiff stated that he does not enjoy these activities because he is "distracted by thoughts, worries, [and] memories."  (Tr. 179.)  Plaintiff reported that he usually prepares one full meal per day, which takes an hour or more.  (Tr. 177.)  Plaintiff also reported that his impairments cause him to "skip meals, [and] eat junk."  (Tr. 176.)  Plaintiff reported that he used to enjoy gourmet cooking, but now had no interest.  (Tr. 177.)  Plaintiff reported cleaning

weekly, doing laundry, mowing, and performing minor repairs, activities which took him between a few hours and all day to perform. (Tr. 177.) Plaintiff's significant other needed to remind him to take care of his personal hygiene, take medicine, and do chores. (Tr. 177.)

Plaintiff reported shopping in stores and by mail for groceries and clothing. (Tr. 178; *see* Tr. 179.) Plaintiff went shopping once per week for four hours. (Tr. 178.) Plaintiff stated that he can only drive "for short periods of an hour or more" because he gets angry and sometimes drives aggressively. (Tr. 178.) Plaintiff reported that his significant other handled their finances because he does not "have the patience" and "would blow money" without her budgeting. (Tr. 179.)

In regards to his social activities, Plaintiff stated that he prefers to be alone, does not have any friends, and does not interact well with others. (Tr. 179; 180.) Plaintiff talked to his parents once per week and attended therapy appointments monthly. (Tr. 179.) Plaintiff's significant other needed to remind him of appointments. (Tr. 179.) Plaintiff reported taking his significant other to church twice per month. (Tr. 179.) Plaintiff reported that he gets along "fairly well" with his immediate family, but has gotten into "fights with neighbors." (Tr. 180.) Plaintiff stated that he "used to be very social, volunteer, [and] help others," but is unable to do so any more. (Tr. 180.)

Plaintiff reported that his impairments affect his ability to remember, concentrate, understand, and get along with others. (Tr. 180.) Plaintiff explained that he has "trouble focusing, remembering details, [and] at times cannot understand people." (Tr. 180.) Plaintiff also stated he has difficulty trusting others and has "a much lower threshold" for

opinions that are not his own.  (Tr. 180.)  Plaintiff estimated that he could pay attention for one hour to one and one-half hours, but also reported that he does not finish what he starts.  (Tr. 180.)  When asked about his ability to follow written instructions, Plaintiff reported that he "tend[s] to flit around, sometimes tr[ies] to do too much, get[s] tired[,] stop[s], [and] do[es] something else."  (Tr. 180.)  Plaintiff stated that it is hard for him "to stay on task."  (Tr. 180.)  Plaintiff described his ability to follow spoken instructions as "fairly well" so long as they are not too long or too complicated.  (Tr. 180.)

Plaintiff reported having difficulty with authority figures, including police and bosses.  (Tr. 181.)  Plaintiff stated that he "will not be treated poorly, and ha[s a] low tolerance [for] anyone flaunting authority."  (Tr. 181.)  Plaintiff reported that his mouth also gets him in trouble.  (Tr. 181.)  Plaintiff indicated that he has been fired or asked to resign from every job he has had since he retired from the military in 1998.  (Tr. 181, 190.)  Similarly, Plaintiff reported that he does not handle stress well, e.g., lashing out verbally, becoming angry, walking away, arguing, swearing, and complaining.  (Tr. 181.)  Plaintiff also stated that he does not like change and "want[s] things to stay the same."  (Tr. 181.)

### B.  Initial Determination

As stated above, Plaintiff's application for DIB was denied initially.  (Tr. 56, 57, 58.)  Plaintiff was determined to have the severe impairments of affective and anxiety disorders and neither of these impairments when considered individually or in combination met or equaled a listed impairment.  (Tr. 50-51.)  Janis L. Konke, M.S., L.P., determined that Plaintiff had mild restriction in his activities of daily living and moderate

difficulties in social functioning and maintaining concentration, persistence or pace.  (Tr. 50.)

In assessing Plaintiff's mental residual functional capacity, Konke determined that Plaintiff had limitations in sustained concentration and persistence and no understanding or memory limitations.  (Tr. 52.)  Specifically, Konke determined that Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 52, 53.)  Plaintiff was not significantly limited in his ability to carry out very short and simple or detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; and make simple work-related decisions.  (Tr. 52, 53.)  Konke opined that Plaintiff "retains the ability to concentrate and attend to 3-4 step and limited detail tasks but [wo]uld be moderately impaired for complex and technical issues."  (Tr. 53.)

Konke also determined that Plaintiff had limitations in his ability to interact socially.  (Tr. 53.)  Plaintiff was moderately limited in his ability to interact appropriately with the public and accept instructions from and respond appropriately to criticism from supervisors.  (Tr. 53.)  Plaintiff was not significantly limited in his ability to ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriately behavior; and

adhere to basic standards of neatness and cleanliness. (Tr. 53.) Konke opined that Plaintiff "retains the ability to tolerate superficial interaction with supervisors, coworkers and the public" and "in this context he can tolerate ordinary supervision." (Tr. 53.)

Lastly, Konke determined that Plaintiff had adaptation limitations. (Tr. 53.) Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting and was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions; travel to unfamiliar places and use public transportation; and set realistic goals or make plans independently of others. (Tr. 53.) Konke opined that Plaintiff's "[s]tress tolerance is reduced however he can tolerate routine changes in the work environment." (Tr. 53.)

Although Plaintiff was not able to do his past work, Plaintiff was determined to be not disabled because he could have done other "work that is simple and not stressful" based on his age, education, and work experience. (Tr. 57.)

### C. Following the Initial Determination

Following the initial determination, Plaintiff completed another disability report. (Tr. 193-97.) Plaintiff indicated that, since his last disability report, he has had increased problems with sleep, personal hygiene, anger, anxiety, worry, and "not getting along with loved ones." (Tr. 193; *see* Tr. 194, 196.) Plaintiff also reported that his depression was worsening and he was procrastinating with household chores. (Tr. 196.) Plaintiff further stated:

> I have a lot of mental anguish about not being able to work, whi[c]h has [been] taken up during counseling with Dr. Hegeman—have concluded that work[]worsened my PTSD

23

> symptoms, anger, anxiety, [and] depression, reasons I put in
> for the VA disability benefits, since my service connected
> problems cause me to lose or get fired from every job I have
> had since the military retirement in 1998. . . . I require
> ongoing regular counseling to care [sic] to maintain some
> semblance of balance of regularity and normalcy . . . . I am
> working hard with the VA to try and improve my life—but I
> still need to request for more help.

(Tr. 197.)

Plaintiff also completed another function report, which was largely similar to his previous report. (*Compare* Tr. 199-202 *with* Tr. 175-82.) Plaintiff continued to report hypervigilance, anxiety attacks, trouble sleeping, and difficulties getting along with others. (Tr. 199, 200, 202.) His daily activities were about the same. (Tr. 200.)

### D. Reconsideration Determinations

On reconsideration, Plaintiff was again determined to have the severe impairments of affective and anxiety disorders. (Tr. 63-64.) Mary X. Sullivan, Ph.D., also concluded that none of these impairments met or equaled a listed impairment. (Tr. 64-65.) Like Konke, Sullivan found that Plaintiff had mild restriction in activities of daily living and moderate difficulties with social functioning and maintaining concentration, persistence, or pace. (Tr. 64.) Sullivan affirmed Konke's mental-residual-functional-capacity assessment. (Tr. 66-67.) Plaintiff was again determined not to be disabled and the prior determination was affirmed. (Tr. 69, 71, 72.)

### E. Following the Reconsideration Determination

After his DIB application was denied again on reconsideration, Plaintiff completed another disability report, answering "yes" when asked if there had been any change (for

better or worse) in his conditions since his last disability report. (Tr. 20.) Plaintiff did not, however, describe the change(s). (Tr. 205.)

## VI. ALJ PROCEEDINGS & DECISION

### A. Hearing Testimony

At the hearing, Plaintiff testified that he served 20 years in the military before retiring and receiving his pension. (Tr. 37; *see* Tr. 43.) Plaintiff also testified that he spoke with his "counselor" about working "many times" and decided that "working was actually aggravating . . . [his] condition." (Tr. 43.) Plaintiff further testified that he has been terminated or asked to resign from all of the jobs he has had since leaving the military. (Tr. 43.)

The ALJ asked the vocational expert whether a hypothetical individual with the mental residual functional capacity identified by the state agency psychological consultants would be capable of performing any of Plaintiff's past relevant work. (Tr. 39.) The vocational expert testified that such an individual could perform the jobs of sales attendant and warehouse worker. (Tr. 40.) The ALJ then asked the vocational expert whether a hypothetical individual with the limitations identified by Hegeman could perform any of Plaintiff's past relevant work or any other work. (Tr. 40-41.) The vocational expert testified that the limitations identified by Hegeman would preclude competitive employment. (Tr. 41.)

### B. ALJ's Decision

The ALJ found and concluded that Plaintiff had the severe impairments of major depressive disorder and posttraumatic stress disorder and neither of these impairments

individually or in combination met or medically equaled a listed impairment in 20 C.F.R.

Part 404, Subpart P, Appendix 1.  (Tr. 12-15.)  The ALJ found that Plaintiff

> had the residual functional capacity to perform a full range of
> work at all exertional levels but with the following
> nonexertional limitations: reduced to 3- to 4-step or limited
> details tasks, nothing complicated or technical, could tolerate
> superficial interaction with supervisors, coworkers, and the
> public, probably ought to have brief contact in that regard

(Tr. 15.)

In reaching this residual-functional-capacity determination, the ALJ concluded

that "[t]he record shows limited and only conservative mental health treatment," which

was "inconsistent with the disabling level of impairment alleged."  (Tr. 16.) The ALJ

further noted that "[t]he record also shows a high level of activities of daily living that are

also inconsistent with a disabling level of mental and physical symptoms," including

Plaintiff's role as a caretaker for his significant other with multiple sclerosis and his

ability to prepare meals, wash dishes, do some household chores, perform minor repairs,

mow the lawn, watch television, read, drive, shop in stores, garden, take his significant

other to church, talk to his parents over the phone, and attend counseling.  (Tr. 16.)

The ALJ observed that Plaintiff's "[t]reatment records show a stable condition

with at most a moderate level of impairment from symptoms," pointing to therapy

records after Plaintiff's date last insured "show[ing] a stable condition with similar

mental status examination findings and functioning, with sessions usually focused on

relationship issues."  (Tr. 16.)  The ALJ also observed that, shortly after Plaintiff's date

last insured, Hegeman updated Plaintiff's mental-health treatment plan and indicated that

Plaintiff needed an hour or less of treatment per month. (Tr. 17.) The ALJ also gave significant weight to the GAF scores of 53 in November 2011 and 55 in April 2012, because they were consistent "with the treatment plan and the limited and conservative course of treatment and relatively good mental status examination findings reflected in subsequent treatment notes" and "the moderate level of mental limitations documented in the longitudinal record from shortly after the date last insured and for 12 months after the date last insured." (Tr. 17.)

In weighing the opinion evidence, the ALJ gave great weight to the opinions of the state agency psychological consultants based on their familiarity with the Social Security disability process and the consistency of their opinions with the record as a whole with one exception. (Tr. 18.) Acknowledging that the state agency psychological consultants "concluded that . . . [Plaintiff's] stress tolerance and ability to respond appropriately to changes in the workplace was reduced," the ALJ determined that "the record as a whole does not support a need for further limits related to difficulty adapting to changes or tolerating stress within the parameters of the limits to 3- to 4-step and limited detail tasks and social limits." (Tr. 18.)

With respect to Hegeman, the ALJ explicitly recognized her as a treating source but gave her opinion "limited weight because the high level of mental impairment she described is not consistent with her own treatment notes as well as the whole record regarding . . . [Plaintiff's] functioning and the course of treatment from the alleged date of onset through the date last insured." (Tr. 18.) The ALJ explained that Plaintiff's course of treatment—psychotherapy one to two times per month and medication

management four times per year, or as needed—was "not consistent with 'no useful ability to function,' being off task 25 percent or more in a typical workday, or a need for four or more absences a month due to mental symptoms." (Tr. 19.) The ALJ also stated that "[w]hile the record supports moderate limitations in social functioning and responding to change, the level of limitation . . . [Hegeman] assessed is not consistent with the normal mental status examination findings, ability to interact appropriately with treatment providers, and . . . [Plaintiff's] activities of daily living including shopping and attending church." (Tr. 19.)

The ALJ noted that Hegeman's treatment records reflected Plaintiff's "ability to take feedback and make changes in his styles of communication and perceptions of interactions based on [that] feedback." (Tr. 19.) The ALJ also pointed out that Hegeman noted that Plaintiff was able to "use skills to calm down despite increased distress about the disability evaluation process and . . . participate effectively, ask relevant questions, and make appropriate comments, which contrasts with the limitations she described in the form." (Tr. 19.)

As for the materials related to the VA disability process, the ALJ observed that the "VA regulations regarding disability have a different standard of proof and presumptions, which often result in findings of eligibility for VA disability inconsistent with the requirements of Social Security regulations." (Tr. 19.) The ALJ stated that Plaintiff "worked at the level for substantial gainful activity for a number of years after his military service ended despite his longstanding impairments." (Tr. 19.) The ALJ concluded that "the record documents the medically determinable impairments listed by

the VA but the . . . residual functional capacity is more consistent with the objective medical evidence and the course of treatment for . . . [Plaintiff's] physical and mental impairments as well as his high level of activities of daily living." (Tr. 19.)

The ALJ contrasted Plaintiff's report to Siegel, the compensation and pension examiner, that his panic symptoms "had occurred weekly in the past but had become less frequent, occurring once a month or so" with Plaintiff's "reporting in the context of this disability claim of frequent anger and anxiety attacks several times a week." (Tr. 20.) Acknowledging that Plaintiff's MMPI-2 results were determined to be valid and showed "very significant levels of psychological/emotional distress with social awkwardness and avoidance and a focus on somatic symptoms," the ALJ reasoned that, while these results were consistent with Plaintiff's subjective reports, they were "inconsistent with the stable and relatively good functioning reflected in his psychological treatment records and activities of daily living." (Tr. 20.) The ALJ gave "significant weight," however, to the GAF score of 60 assigned by Siegel "because the mental status examination in December 2010 and the therapy notes from 2011 are consistent with at most a moderate level of symptoms and impact on functioning." (Tr. 20.)

Among other things, the ALJ also observed that Plaintiff's military pension and receipt of VA disability benefits "suggest[ed] less motivation to attempt to return to work" and Plaintiff's statements that he had been fired from all previous jobs due to difficulty getting along with others were inconsistent with his report during the disability process that he was laid off due to lack of work. (Tr. 16.) The ALJ found and concluded that Plaintiff was able to perform his past relevant work as a sales attendant and

warehouse worker and, accordingly, Plaintiff was not under a disability from February 2 through September 30, 2011.  (Tr. 21.)

## VII. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole.  *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).  "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision."  *Id.*  This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it."  *Id.*  The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ."  *Id.*; *accord Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012).  "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole."  *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted).  Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision."  *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability.  42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.315.  An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a). As stated above, Plaintiff must have been disabled prior to the date last insured in order to receive DIB. *See Moore*, 572 F.3d at 522.

Plaintiff's arguments are all directed at the ALJ's determination of his residual functional capacity at step four and the weight assigned to Hegeman's opinion.[14]  *Perks*,

---

[14] While Plaintiff also asserts that "[t]he ALJ relied upon an incomplete hypothetical that does not accurately reflect . . . [his] limitations," (Pl.'s Mem. in Supp. at 14), this argument is simply a recasting of Plaintiff's principal argument concerning the weight the ALJ gave to Hegeman's opinion:

> When the limitations in the file from . . . Hegeman were added to the hypothetical, the [vocational expert] testified that there were no jobs in the competitive economy an individual could perform. The improper discrediting of the opinion of . . . [Plaintiff's] long-time treating psychologist and failure to apply those limitations requires that the decision be vacated.

(Pl.'s Mem. in Supp. at 14.)

687 F.3d at 1092 (residual-functional-capacity determination occurs at step four). Plaintiff's "residual functional capacity is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted). At the same time, a residual-functional-capacity determination must be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations." *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quotation omitted). And, "[e]ven though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *see* 20 C.F.R. § 404.1546(c).

## A. Weighing of Opinion Evidence

Plaintiff argues that the ALJ erred by not giving controlling weight to the opinion of Hegeman, his treating psychologist. The opinions of treating sources are "entitled to controlling weight when . . . supported by medically acceptable techniques and . . . not inconsistent with substantial evidence in the record." *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016); *accord Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014); *see* 20 C.F.R. § 404.1527(c)(2). "Yet[, this controlling weight] is neither inherent nor automatic

and does not obviate the need to evaluate the record as a whole." *Cline*, 771 F.3d at 1103 (citation and quotation omitted); *accord Bernard v. Colvin*, 774 F.3d 482, 487 (8th Cir. 2014) ("Since the ALJ must evaluate the record as a whole, the opinions of treating physicians do not automatically control."). A treating source's opinion may be discounted or disregarded "where other medical assessments are supported by better or more thorough medical evidence, or where a treating . . . [source] renders inconsistent opinions that undermine the credibility of such opinions." *Cline*, 771 F.3d at 1103 (quotation omitted).

When a treating source's opinion is not given controlling weight, the opinion is weighed based on several factors. 20 C.F.R. § 404.1527(c)(2); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). These factors include the examining relationship, treatment relationship, opinion's supportability, opinion's consistency with the record as a whole, specialization of the provider, and any other factors tending to support or contradict the opinion. 20 C.F.R. § 404.1527(c). "Whether granting a treating . . . [source's] opinion substantial or little weight, the [C]ommissioner must always give good reasons for the weight she gives." *Cline*, 771 F.3d at 1103 (quotation omitted); *see* 20 C.F.R. § 404.1527(c)(2).

### B. Weight Given to Hegeman's Opinion

More weight is generally given to the opinions of treating sources because "these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of . . . [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical

findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2). There is no dispute that Hegeman had a lengthy treating relationship with Plaintiff. *See id.* § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's opinion."). There is also no dispute that Hegeman routinely conducted mental status examinations as part of Plaintiff's psychotherapy sessions. *See* 20 C.F.R. §§ 404.1527(c)(1) (more weight given to sources who have examined the claimant), (2)(ii) (considering types of treatment provided by source and nature and extent of examinations).

The ALJ recognized the existing treatment relationship between Plaintiff and Hegeman, demonstrating consideration of both the examining and treating factors. 20 C.F.R. §§ 404.1527(c)(1) (examining relationship), (2) (treating relationship). The ALJ determined, however, that Hegeman's opinion should receive "limited weight" because it was internally inconsistent, inconsistent with her treatment notes, and inconsistent with the record as a whole regarding Plaintiff's functioning and course of treatment. Accordingly, the Court turns to the supportability and consistency factors.

### 1. Supportability

Beginning with supportability, greater weight is given to opinions that are supported by medical evidence and better explained by the source. 20 C.F.R. § 404.1527(c)(3). Hegeman stated that her opinion was supported by her assessment of Plaintiff, observations of Plaintiff during psychotherapy, and reports by Plaintiff and his significant other. There are no treatment notes in the record from Hegeman until after

Plaintiff's date last insured. Shortly after Plaintiff's date last insured, however, Hegeman assessed Plaintiff as needing an hour of psychotherapy per month or less, despite noting that Plaintiff would benefit from attending more frequently. Approximately six months later, she recommended two to eight hours of psychotherapy per month. Treatment notes from shortly after Plaintiff's date last insured and during the following year show that Plaintiff was making progress managing his anger and frustration, utilizing coping strategies, and showing greater insight. Although Plaintiff was angry and irritable at times, he calmed down during the sessions, his mood was often noted to be euthymic or neutral, and his mental status examinations were largely normal.

These observations are inconsistent with Hegeman's opinion that Plaintiff had no useful ability to function, would be off-task 25% or more of the time, or would be absent from work four or more days per month. As noted by the ALJ, Hegeman's treatment notes show that Plaintiff was able to utilize coping skills, participate in their sessions, "ask relevant questions, and make appropriate comments, which contrasts with the limitations . . . [Hegeman] described in the form." (Tr. 19.) "An ALJ may justifiably discount a treating physician's opinion when that opinion 'is inconsistent with the physician's clinical treatment notes.'" *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (quoting *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009)). Here, the ALJ properly considered that Hegeman's opinion was not supported by her own her treatment notes when determining how much weight to give it.

Moreover, the ALJ correctly observed that circumstances suggested Hegeman "relied excessively on . . . [Plaintiff's] subjective reporting about his functional

limitations" in generating her opinion. (Tr. 19.) As the Commissioner points out, Hegeman discussed her responses with Plaintiff, reviewed certain items with him, and sought input from him regarding his functional limitations. An ALJ does not err in giving less weight to the opinion of a treating source that is based largely on a claimant's subjective complaints rather than objective findings. *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012). Accordingly, the ALJ did not err in taking into account the extent to which Hegeman relied on Plaintiff's subjective reports when evaluating what evidence she used to support her opinion. This is particularly true considering the inconsistency between Hegeman's conclusion that Plaintiff had no useful ability to function and the level of functioning documented in Hegeman's treatment notes.

Similarly, the internal inconsistencies in Hegeman's opinion identified by the ALJ also go the supportability factor. Internal inconsistencies are an appropriate basis for discounting a treating source's opinion. *Anderson v. Barnhart*, 344 F.3d 809, 812-13 (8th Cir. 2003) (ALJ properly credited one-time consultant over treating physician based on inconsistencies in treating physician's opinion); *see Myers*, 721 F.3d at 525 ("[W]e have upheld an ALJ's decision to discount a treating physician's opinions where those opinions were internally inconsistent."). Hegeman opined that Plaintiff had no useful ability to function, would be off-task 25% or more of the time, and would be absent four or more days per month. Yet, she also opined that Plaintiff had a *good* ability to understand, remember, and carry out short, simple instructions; make simple work-related decisions; remember locations and work-like procedures; maintain a regular schedule and attendance; sustain an ordinary routine without special supervision; ask

36

simple questions or request assistance; adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently. The ALJ correctly observed that Hegeman's assessment of Plaintiff's functional abilities "reflect[ed] a higher level of functioning than other portions of the opinion." (Tr. 19.)

In sum, the ALJ gave good reasons for discounting Hegeman's opinion and giving greater weight to the opinions of the state agency psychological consultants when the evidence Hegeman cited in support of her opinion actually weakened it and the opinion itself was internally inconsistent.

### 2. Consistency

Turning to the consistency factor, more weight is given to opinions that are more consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(4). Plaintiff argues that the ALJ should have accorded controlling weight to Hegeman's opinion because it was consistent with his MMPI-2 results, subjective reports, and daily activities. Notably, the ALJ addressed each of these pieces of evidence and Plaintiff has not challenged the ALJ's evaluation of the evidence except as it relates to the weight accorded to Hegeman's opinion.

Starting first with Plaintiff's activities as they frequently permeate the ALJ's analysis, Plaintiff argues that the ALJ placed too much emphasis on Plaintiff's daily activities, which were primarily performed from the comfort of his home. Plaintiff is correct that he "need not prove he is bedridden or completely helpless to be found

disabled." *Boettcher*, 652 F.3d at 866 (quotation omitted). "To be sure, a claimant's ability to engage in personal activities such as cooking, cleaning, and hobbies does not preclude a finding that the claimant is disabled." *Milam v. Colvin*, 794 F.3d 978, 984 (8th Cir. 2015) (quotation omitted); *accord Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir. 1998). Nevertheless, "acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." *Halverson*, 600 F.3d at 932 (quotation omitted). "Simply put, the nature of the medical condition and the nature of the life activities, including such considerations as independence, should be considered against the backdrop of whether such activities actually speak to claimant's ability to hold a job." *Nowling v. Colvin*, 813 F.3d 1110, 1121-22 (8th Cir. 2016); *see Wagner*, 499 F.3d at 851.

But, if a treating source opines that a claimant has greater limitations than the claimant actually exhibits in his or her daily living, the "ALJ need not ignore the inconsistency" in determining the weight accorded to the treating source. *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012). Here, Plaintiff's activities are inconsistent with Hegeman's conclusion that he has no useful ability to function, would be off-task 25% or more of the time, and would be absent four or more days per month. As the ALJ stated, "[t]he record . . . shows a high level of activities of daily living." (Tr. 16.) Plaintiff's activities include his role as the primary caregiver to his significant other who has multiple sclerosis and is confined to a wheelchair and his reports of preparing meals, doing some household chores, performing minor repairs, mowing the lawn, watching television, reading, driving, shopping for hours in stores, gardening, and attending

church.  The ALJ did not err in concluding that the extent and quality of Plaintiff's activities overall show greater functionality than Hegeman opined and therefore support discounting Hegeman's opinion.  *See Milam*, 794 F.3d at 984; *Anderson*, 696 F.3d at 790.

Plaintiff next argues that the ALJ disregarded his subjective reports regarding a lack of patience, difficulty getting along with others, avoidance of crowds, trouble sleeping, and poor memory and concentration.  First, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible—a finding that Plaintiff does not challenge.  Second, the ALJ did not disregard Plaintiff's subjective reports.  The ALJ discussed Plaintiff's lack of patience, difficulty getting along with others, avoidance of crowds, trouble sleeping, and cognitive functioning when evaluating Plaintiff's level of impairment with regards to social functioning and maintaining concentration, persistence, or pace, concluding that Plaintiff in fact had moderate difficulties in both areas.  Third, as stated by the Commissioner, consideration of each of these subjective complaints is also reflected in the ALJ's residual-functional-capacity determination.  The ALJ limited Plaintiff to three-to-four-step or limited-detail tasks, specifically excluding complicated or technical tasks.  The ALJ also limited Plaintiff to brief, superficial interaction with supervisors, coworkers, and the public.  Notably, even Hegeman opined that Plaintiff's ability to interact with the public, get along with coworkers, and maintain socially appropriate behavior was fair.  Accordingly, while the ALJ did not fully credit the alleged functional impact of Plaintiff's symptoms, the ALJ plainly took his symptoms into account and did not disregard them.

Lastly, Plaintiff argues that the MMPI-2 testing revealed that he had very significant levels of psychological/emotional distress, significant depressive symptoms accompanied by a general lack of interest or pleasure in day-to-day activities, and significant anxiety, tension, and nervousness. Plaintiff argues that his profile was "noted to be consistent with individuals who 'tend to feel uncomfortable and awkward in social/interpersonal situations and invest considerable time in avoiding such,'" which is consistent with Hegeman's conclusions that he "can only some of the time interact appropriately with the public, get along with co-workers and peers, and maintain socially appropriate behavior" and has no useful ability to accept instructions, respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. (Pl.'s Mem. in Supp. at 12.)

The ALJ concluded that the MMPI-2 results "were inconsistent with the stable and relatively good functioning reflected in . . . [Plaintiff's] psychological treatment records and activities of daily living." (Tr. 20.) Notwithstanding this conclusion, there is significant overlap between the MMPI-2 results and the ALJ's decision. The ALJ determined that Plaintiff's posttraumatic stress disorder and depression were both severe impairments, thus recognizing that these impairments significantly limit Plaintiff's ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c) ("If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled."). And, as previously discussed, the ALJ's residual-functional-capacity determination accounted for Plaintiff's moderate difficulties

in social functioning. Siegel, the examiner, likewise concluded that Plaintiff had moderate social and occupational impairment as a result of his posttraumatic stress disorder and depression.

In the end, the ALJ relied on other evidence in the record regarding Plaintiff's ability to function, including Plaintiff's own descriptions of his symptoms and daily activities, numerous mental status examinations, and specific observations from Hegeman's treatment notes that Plaintiff was able "to take feedback and make changes in his styles of communication and perceptions of interactions based on feedback," use coping skills, "participate effectively, ask relevant questions, and make appropriate comments." (Tr. 19.) *See Myers*, 721 F.3d at 527. While Plaintiff's MMPI-2 results could arguably support greater limitations, there is substantial evidence in the record to support the ALJ's conclusion that the high level of impairment contained in Hegeman's opinion was not consistent with the record as a whole.

The ALJ's detailed discussion of the medical evidence, Plaintiff's daily activities, and Plaintiff's subjective complaints demonstrates that the ALJ carefully considered Hegeman's opinion the context of the entire record. Substantial evidence supports the ALJ's assignment of less weight to Hegeman's opinion based on its inconsistency with the record as a whole.

### 3. Conclusion

Hegeman's status as a treating source entitles her opinion to controlling weight so long as it is supported by medically acceptable techniques and not inconsistent with substantial evidence in the record. *Julin*, 826 F.3d at 1088; *Cline*, 771 F.3d at 1103; *see*

20 C.F.R. § 404.1527(c)(2). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner*, 499 F.3d at 848 (quotation omitted). In this case, the ALJ considered the appropriate factors in determining the weight to be given to Hegeman's opinion, including its supportability and consistency with the record as a whole. The ALJ gave good reasons for discounting Hegeman's opinion, including the lack of support for the opinion in her treatment notes, the opinion's internal inconsistencies, and the inconsistency between the opinion's conclusion regarding Plaintiff's level of impairment and the evidence in the record as a whole. Moreover, the ALJ did not entirely disregard Hegeman's opinion and several aspects of it are reflected in the residual-functional-capacity determination.

Based on the foregoing, the Court concludes that the limited weight the ALJ assigned to Hegeman's opinion is supported by substantial evidence in the record and the ALJ did not err in declining to give controlling weight to the opinion of this treating source. Because the ALJ did not err in weighing the opinion evidence and there is substantial evidence in the record to support the ALJ's residual-functional-capacity determination, the Court recommends that the Commissioner's motion be granted and Plaintiff's motion be denied.

## VIII. RECOMMENDATION

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 12) be **DENIED** and Defendant's Motion for Summary Judgment (ECF No. 16) be **GRANTED**.

Dated: July___31_____, 2017                              _____*s/ Tony N. Leung*_____
                                                         Tony N. Leung
                                                         United States Magistrate Judge
                                                         for the District of Minnesota

                                                         *Sigerseth v. Berryhill*
                                                         Case No. 16-cv-3296 (JRT/TNL)

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).